[No. H014390. Sixth Dist. June 5, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL MERCER McLAUGHLIN, Defendant and Appellant.

**COUNSEL**

David Fuller, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—Defendant Daniel Mercer McLaughlin was convicted after court trial of two counts (3 & 4) of threatening witnesses in criminal proceedings (Pen. Code, § 140)[1] and one count (5) of attempted theft of over $400 in cash (§§ 664, 487). He was acquitted of two counts (1 & 2) of soliciting murder (§ 653f).

The trial court sentenced defendant to prison for the upper term of four years on count 3, with a concurrent four-year term on count 4, and a

---

[1] Unspecified section references are to the Penal Code.

concurrent one-year term on count 5. The trial court suspended execution of the sentence and placed defendant on five years' probation, including the following conditions: one year in county jail; avoiding contact with the witnesses; obeying directions of the county mental health department regarding therapy and medication; paying $600 to the restitution fund.

On appeal, defendant contends that he did not violate Penal Code section 140 because the threats were never communicated to the intended victims. We will affirm the judgment because Penal Code section 140 does not require that the threats be communicated to the intended victims.

*Facts*

While defendant was in jail between October 7 and 12, 1994, for driving under the influence, another inmate approached him and said Jasper (Jay) Logsden wanted to talk to him. Defendant agreed to talk to Logsden. Logsden was also in the jail, facing child molestation charges involving two girls named Michelle and Christie.

Logdsen told defendant that he would pay to have two witnesses killed. Logdsen said they had a crack problem. One might be hard to find because she was out on the streets. Defendant said he could have someone do it, but he wanted to think about it. Defendant testified that he did not believe Logdsen at first, but he learned from other inmates that Logdsen was facing a lot of prison time. He believed that Logdsen wanted the witnesses killed. Logdsen said he did not want to talk in jail because he thought the rooms were bugged.

Defendant wrote Logdsen a note stating: "The two cupcakes you need to be eatten [*sic*] up will not be a problem. I need to know for sure A.S.A.P [*sic*] because I will get everything together for it. Pictures and area the cupcakes are in will be needed. Have your brother Western Union it or bring it to jail and leave it." The note also included a phone number in Santa Cruz.

Logdsen turned the note over to his attorney, who turned it over to an assistant district attorney, who brought it to a Santa Cruz County Sheriff's detective, Aaron Morse. On October 14, 1994, Morse called the phone number and reached defendant on his second call. Morse identified himself as a friend of Logdsen. When Morse referred to the letter defendant had written, defendant insisted on talking in person. Defendant agreed that he would do the job for $5,000. They agreed that Morse would call defendant the next day after talking to Logdsen. A recording and a transcription of this conversation were in evidence.

Morse called the following day and left a pager number with an elderly woman for defendant to call. The pager belonged to Detective Jim Hart. Defendant paged Hart and they talked on the phone in the afternoon. Hart told defendant if he wasn't serious about his offer, he would find someone else. Defendant said he was "very serious." They agreed defendant would page Hart the following day.

Defendant called Hart the following morning and they agreed to meet in a Felton shopping center. They agreed they would lift their shirts in proof they were not armed.

They met on October 16, 1994, about 12:30 p.m., introduced themselves, and lifted their shirts. Hart said he wanted to make sure no one had a wire or a gun. Hart was wearing a wire in the crotch of his pants. He told defendant that he owed Logdsen big because Logdsen had done him a lot of favors. They agreed Logdsen was facing a lot of prison time.

Defendant explained that the original deal was for ten, because the guy he works with in East San Jose charges four or five each. But Hart had mentioned five. Defendant agreed to twenty-five (hundred) up front and twenty-five more when it was done. Hart said maybe five was a little low.

Defendant said he would present two pictures as proof of how fast he works. He was going to meet with his other half that night. He asked if Hart had some stuff. Hart said he had a packet.

Defendant said it had to be done quick because he had another job in Hawaii to drop a girl in the ocean with an anchor. The girl was using up the dope that she used to sell for his friend. Defendant said he did this part time. He does about three or four a year. Any more and he might get caught. Hart agreed. He was only the middleman.

Defendant and Hart both worried aloud that the other one was a cop. They reassured each other they were not.

Defendant said he wanted Logdsen to get out of it. He did not care if Logdsen had sex with young girls. He was just there to do a job.

Hart said Michelle would be easy because she was walking the streets. But Christy would be tough.

Defendant said he had a guy with a limousine company. He was going to wear a suit and tell Christy he had a lot of money because Logdsen said she

might be hard. Defendant said she would not be that hard because they all like nose candy.

Hart said he heard she was hiding. Defendant said he had a friend who used to be a Santa Cruz cop whom he provided with pot. The ex-cop had radios, cbs, scanners, and a computer thing that would allow him to find Christy. Defendant said he would like her birth date. Hart said he could get defendant addresses and pictures the following day.

Hart said he did not want it to look like a message. Defendant said it would not be messy at all. He could not show Hart a portfolio, but he had done about fifteen of these and they were not messy. The trick was to take the bodies in a U-Haul and dispose of them far away. A recording and a transcription of this conversation were in evidence.

Hart gave defendant $500, 10 percent, and gave a signal for defendant's arrest.

Defendant's grandmother was with him. She said that defendant told her that he was meeting a man named Jay who needed help in evicting some tenants in Los Gatos. She said defendant was not living with her and had not even stayed one night since arriving from Hawaii.

A search of defendant revealed information on a flight to Hawaii. He had made a reservation for October 19th. They searched defendant's car and found no evidence he was a hit man.

At trial defendant testified his only intent was to rip off Logdsen. He wanted to take the money and fly to Hawaii, where he lived.

*The Statute Does Not Require Communication of the Threat*

Defendant was convicted of violating section 140, which states: "Except as provided in Section 139, every person who willfully threatens to use force or violence upon the person of a witness to, or a victim of, a crime or any other person, or to take, damage, or destroy any property of any witness, victim, or any other person, because the witness, victim, or informant has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding, shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison for two, three, or four years."

Section 139 states in pertinent part: "(a) Except as provided in Sections 71 and 136.1, any person who has been convicted of any felony offense

specified in Section 12021.1 who willfully and maliciously *communicates* to a witness to, or a victim of, the crime for which the person was convicted, a credible threat to use force or violence upon that person or that person's immediate family, shall be punished by imprisonment in the county jail not exceeding one year or by imprisonment in the state prison for two, three, or four years." (Italics added.)

Section 71 provides in pertinent part: "Every person who, with intent to cause, attempts to cause, or causes, any officer or employee of any public or private educational institution or any public officer or employee to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly *communicated* to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out, is guilty of a public offense punishable as follows: . . ." (Italics added.)

█ Defendant's position is essentially that a threat is not a threat in violation of section 140 unless it is communicated. The Attorney General's position is that if the Legislature had intended communication of the threat to be an element of section 140, it would have included the word "communicate" as it has in other statutes prohibiting threats, such as sections 139, subdivision (a), and 71 quoted above. (E.g., § 137, subd. (b) [threat intended to dissuade witness from telling truth]; § 11412 [threat intended to inhibit religious exercise].)

Other cases involving section 140 have not considered this issue. (E.g., *People* v. *McDaniel* (1994) 22 Cal.App.4th 278, 283-284 [27 Cal.Rptr.2d 306].) *People* v. *Carrera* (1989) 49 Cal.3d 291 [261 Cal.Rptr. 348, 777 P.2d 121], on which defendant relies, does not dictate a different conclusion. The Supreme Court simply rejected a defendant's argument that there was insufficient evidence that the threat was communicated to the potential victim. (*Id.* at p. 341.) We do not understand *Carrera* to have implicitly adopted the defendant's argument that communication was an element of the offense.

█ The judicial objectives in construing a statute are to ascertain and implement the legislative intent. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) We seek to harmonize statutes concerning the same topic and give meaning to every part. (*Id.* at pp. 1009-1010.) We assume that the Legislature has used different words in describing similar crimes to apply to different situations. (*Id.* at p. 1010; *People* v. *Aston* (1985) 39 Cal.3d 481, 491, fn. 9 [216 Cal.Rptr. 771, 703 P.2d 111].) █ If communication were an element of section 140, the Legislature would have included the words "comunication of the threat to the victim" in the statute.

The obvious intent of the statute is to preserve and protect witnesses. Protection of witnesses does not require that the witness be personally aware of the threat involving force or violence. We conclude that section 140 prohibits the threats it describes, whether or not the threats are communicated to the potential victim.

*Disposition*

The judgment is affirmed.

Cottle, P. J., and Mihara, J., concurred.