Filed 8/11/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S179422 |
| v. | ) | |
| | ) | Ct.App. 4/2 E047614 |
| EDDIE JASON LOWERY, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. INF062558 |
| _____ | ) | |

In a recorded telephone conversation with his incarcerated wife, defendant said he would kill Joseph Gorman, an 88-year-old man who had accused the couple of stealing $250,000 from his mobile home and who had testified against them in court. Based on defendant's comments, he was charged with violating a state statute that prohibits "willfully" threatening violence against a crime witness or victim. (Pen. Code, § 140, subd. (a) (§ 140(a)); further undesignated statutory references are to the Pen. Code.) A jury convicted defendant. On appeal, defendant argued that because the statute lacked a specific intent requirement, it infringed his right to free speech under the federal Constitution's First Amendment. The Court of Appeal disagreed and upheld the conviction.

Does section 140(a) violate the First Amendment, as defendant contends? Or does the statute target only "true threats," a category of speech that has no First Amendment protection?

1

We construe section 140(a) as requiring proof that a reasonable person would understand the allegedly threatening statements — when considered in their context and surrounding circumstances — "to communicate a serious expression of an intent to commit an act of unlawful violence," the high court's definition of a " 'true threat.' " (*Virginia v. Black* (2003) 538 U.S. 343, 359.) So construed, section 140(a) does not run afoul of the First Amendment. Although, as noted earlier, the Court of Appeal upheld the constitutionality of the statute, it did so on grounds different from the reasonable person standard just articulated. Therefore, we reverse the judgment of the Court of Appeal and remand this case to that court to consider whether our holding affects defendant's judgment of conviction.

**I**

On June 26, 2007, 88-year-old Joseph Gorman hired defendant and his wife, Veronica, to clean Gorman's mobilehome in Cathedral City, Riverside County. Gorman then left for several hours. When he returned, the couple had already departed. Gorman soon discovered the loss of some $250,000 in cash, which he had wrapped in small bundles and hidden under a couch. Gorman called the police. Eventually, defendant and Veronica were charged with theft of the money. They were tried separately. Defendant was acquitted but Veronica was convicted. Veronica was sentenced to state prison and ordered to pay Gorman $250,000 in restitution.

On several occasions between August 2007 and June 2008, while Veronica was incarcerated in the Riverside County jail, defendant talked to her by telephone. Those talks, as generally occurs with inmates' telephone calls, were periodically interrupted by recorded warnings that the conversations were being tape-recorded. Included in the recorded telephone conversations between

2

defendant and Veronica, totaling more than 80 minutes, were these statements by defendant:

"I'm going down to Gorman's and I'm gonna steal 250,000 dollars!  I'm a [*sic*] blow his fucken [*sic*] head away!  I will kill the fucken [*sic*] bastard that said I stole 250,000!  I will do it!  You know what?  I stole 100,000 dollars . . . Listen!  Listen!  I stole 100,000 dollars!  I burned it all!  Okay?!  Well, guess what I'm gonna do?!  I'm gonna kill the bastard!  And I'm gonna go down to Mr. Gorman's house, maybe this week, and I'm gonna blow his fucken [*sic*] head away!"

Also:  "I'm not getting mad at you about it, I'm getting . . . I'm gonna get mad at the Lawyer and the D.A. and, and Mr. Gorman, I'm gonna go down there and tell him, 'Look!  You say my wife stole 250,000 . . . you said I stole 250,000!  Let's get the 250,000 out of your house right now!'  Yeah, but he needed to take the 250,000 dollars off, because I'm gonna tell the . . . the . . . that blond-headed chic[k], uh . . . that was uh . . . the D.A. . . . .  I'm gonna kill her!  And I'm gonna kill a lot of people!  So I might do life in prison!  We might be in the same prison!"

And:  "Listen!  Okay, listen!  You, you tell 'em that [your] husband's going down and get 250,000 dollars from that man, and then when he gets the 250,000 dollars, he's . . . he's gonna kill anybody that steps in his way!!"

These statements by defendant led to his prosecution under section 140(a), which prohibits "willfully" threatening to use physical force against a crime victim or witness.

At trial, defendant admitted making the statements but denied any intent to harm Gorman.  Defendant explained that he was simply expressing his anger over Gorman's false accusation that defendant and Veronica had stolen Gorman's $250,000 in cash and over the trial court's order that Veronica pay that amount in restitution.

3

The jury found defendant guilty. The trial court suspended imposition of sentence and placed defendant on probation for three years conditioned upon serving one year in county jail. The Court of Appeal affirmed the judgment. We granted defendant's petition for review to decide whether section 140(a) violates the First Amendment's free speech guarantee.

## II

We begin with a brief overview of the federal decisional law on point here, followed in part III, *post*, by our resolution of the issue presented.

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." (U.S. Const., 1st Amend.) This proscription, as incorporated through the Fourteenth Amendment's due process clause, likewise binds the states. (*Virginia v. Black*, *supra*, 538 U.S. 343, 358.) The provision is not absolute, however. Not within the First Amendment's protection are "certain well-defined and narrowly limited classes of speech" — those " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " (*Virginia v. Black*, *supra*, at pp. 358-359, quoting *R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 382-383.) Falling into that category are what the United States Supreme Court has described as "true threats." (*Virginia v. Black*, *supra*, at p. 343; *Watts v. United States* (1969) 394 U.S. 705, 707-708.)

The high court first used the term "true threat" in *Watts v. United States*, *supra*, 394 U.S. 705, which involved a federal conviction under a statute prohibiting " 'knowingly and willfully' " making a threat " 'to take the life of or to inflict bodily injury upon the President of the United States.' " (*Id*. at p. 705, quoting 18 U.S.C. § 871(a).) The defendant in *Watts*, speaking at a political meeting, said that he had just received a draft notice to report for military service, adding that " '[i]f they ever make me carry a rifle the first man I want to get in my

4

sights is L.B.J. [U.S. President Lyndon B. Johnson].' " (*Id*. at p. 706.) In a short "By the Court" opinion, the United States Supreme Court reversed the conviction, deeming the defendant's statement to be mere "political hyperbole" (*id*. at p. 708) and, as such, not supporting the conviction for threatening to kill or inflict bodily injury on the President of the United States (*id*. at pp. 706-707). The high court stressed that any statute that "makes criminal a form of pure speech . . . must be interpreted with the commands of the First Amendment clearly in mind," and that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." (*Id*. at p. 707.) Applying that distinction in *Watts*, the high court concluded that the defendant's statement about shooting President Johnson was not a "true 'threat.' " (*Id*. at p. 708.) But the high court did not define that term in *Watts*.

Consequently, as the Colorado Supreme Court noted in *People v. Stanley* (Colo. 2007) 170 P.3d 782, various federal appellate courts construing statutes criminalizing threats "almost uniformly applied an objective [reasonable person] standard . . . to determine whether a statement was a true threat." (*Id*. at p. 787; see, e.g., *United States v. Malik* (2d Cir. 1994) 16 F.3d 45, 49 [using a "reasonable person" standard to decide that evidence was sufficient to establish a true threat]; *United States v. Kosma* (3d Cir. 1991) 951 F.2d 549, 552, 556-557 [upholding conviction for threatening President Ronald Reagan after a court trial at which the judge found the defendant guilty using "the objective, reasonable person standard"]; *United States v. Orozco-Santillan* (9th Cir. 1990) 903 F.2d 1262, 1265 [evidence sufficient to establish true threat].)

Thirty-four years after its 1969 decision in *Watts v. United States*, *supra*, 394 U.S. 705, holding that "true threats" fell outside the First Amendment's protection, the high court did define the term: " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an

5

intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " (*Virginia v. Black*, *supra*, 538 U.S. 343, 359-360.)

At issue in *Virginia v. Black*, was a state criminal statute making it unlawful " 'for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place.' " (*Virginia v. Black*, *supra*, 538 U.S. at p. 348, quoting Va. Code Ann. § 18.2-423.) The Virginia statute also provided that burning a cross would be prima facie evidence of an intent to intimidate. (*Virginia v. Black*, at p. 348.) The high court observed that the Commonwealth of Virginia could, without violating the First Amendment's free speech protection, "outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." (*Id.* at p. 363.)

Nonetheless, the high court struck down the Virginia statute; it reasoned that the statute's provision that burning a cross "shall be prima facie evidence of an intent to intimidate" (Va. Code Ann. § 18.2-423) allowed for a conviction "based solely on the fact of the cross burning itself," thus creating " ' "an unacceptable risk of the suppression of ideas." ' " (*Virginia v. Black*, *supra*, 538 U.S. at pp. 363, 365 (plur. opn. of O'Connor, J., joined by Rehnquist, C.J., Stevens & Breyer, JJ.); see *id.*, at p. 385 (conc. & dis. opn. of Souter, J., joined by Kennedy & Ginsburg, JJ.).)

As explained in Justice O'Connor's plurality opinion in that case, the cross burner might well be engaging in "constitutionally proscribable intimidation." (*Virginia v. Black*, *supra*, 538 U.S. at p. 365.) But, the plurality noted, that same

6

conduct might likewise indicate "that the person is engaged in core political speech" protected under the First Amendment. (*Virginia v. Black*, at p. 365.) The plurality went on to state that although punishing cross burning "*done with the purpose of threatening or intimidating a victim*" does not run afoul of the First Amendment (*Virginia v. Black*, at p. 366, italics added), that cannot be said of punishing cross burning intended as "a statement of ideology" or as "a symbol of group solidarity," both of which " 'would almost certainly be protected expression' " (*id*. at pp. 365-366).

Defendant here contends that because section 140(a), the California statute at issue, does not require that the threat be made with an intent to intimidate the crime victim or witness, the statute violates the First Amendment. We discuss that issue below.

### III

Section 140(a), as relevant here, provides: "[E]very person who willfully . . . threatens to use force or violence upon the person of a witness to, or a victim of, a crime or any other person . . . because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding . . . shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison for two, three, or four years." The statutory language includes no requirement that the defendant act with a specific intent to intimidate the particular victim (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284) and does not even require that the threat be communicated to the victim (*People v. McLaughlin* (1996) 46 Cal.App.4th 836, 842).

As noted earlier, defendant here contends that a statute such as section 140(a), which punishes verbal threats, violates the First Amendment unless it is limited to threats made with the specific intent to intimidate the victim. Defendant relies on the high court's decision in *Virginia v. Black*, *supra*, 538 U.S. 343, which, as we have

7

explained, invalidated the Virginia cross-burning statute because of its prima facie evidence provision, which operated to remove the element of the defendant's intent from the jury's consideration. Defendant asserts that because the high court invalidated the Virginia cross-burning statute, a majority of that court must have determined that a conviction under that statute would violate the First Amendment unless a jury found that the defendant's burning of the cross was intended to intimidate an individual or group of individuals. From this premise, defendant reasons that *any* statute that criminally punishes threats must include an element of specific intent to intimidate the victim. We are not persuaded.

The statute at issue in *Virginia v. Black*, *supra*, 538 U.S. 343, expressly prohibited cross burning done " 'with the intent of intimidating any person . . . .' " (*Id*. at p. 348.) That specific intent requirement served to ensure that the prohibited cross burning was limited to cross burning undertaken as a threat. But the statute's prima facie evidence provision, which made a defendant's burning of a cross prima facie evidence of a specific intent to intimidate, in effect directed the jury to convict even if the jury concluded that the cross burning was *not* intended as intimidation but was merely an expression of the defendant's beliefs, and thus was speech protected by the First Amendment. As the high court in *Virginia v. Black*, *supra*, at pages 365-366 explained, cross burning may be undertaken for a variety of nonthreatening reasons (such as "a symbol of group solidarity" or as "a statement of ideology") and thus not constitute a threat at all.

The statute at issue here, section 140(a), prohibits making threats of violence against a crime victim or witness. In *Virginia v. Black*, *supra*, 528 U.S. 343, the high court did not hold that, to pass muster under the First Amendment, a statute such as the one at issue here must limit the prohibited threats to those made

8

with the specific intent to intimidate a particular victim.[1]  Our conclusion finds support in the high court's description of "true threats" in that case:  " '[T]rue threats,' " the high court said, "*encompass* those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (*Virginia v. Black*, *supra*, at p. 359, italics added.)  Thus, the category of threats that can be punished by the criminal law without violating the First Amendment *includes but is not limited to* threatening statements made with the specific intent to intimidate.

Does section 140(a), the California statute at issue here, prohibit only true threats, which fall outside the free speech protection of the First Amendment?  We note that section 140(a) requires that a threat against a crime victim or witness be made "willfully."  But a penal statute's use of the term "willfully" to describe the intent with which an act is done ordinarily implies "simply a purpose or willingness to commit the act," not "any intent to violate law, or to injure another . . . ."  (§ 7, subd. 1; *People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Atkins* (2001) 25 Cal.4th 76, 85.)  Accordingly, a person who under section 140(a) "willfully" utters threatening language against a crime victim or witness could be found to have violated section 140(a) even if the person had no intention of carrying out the threat, as the mere use of the threatening language, without more, completes the crime.

Insofar as practicable, this court will construe a statute so as to " 'render it valid . . . or free from doubt as to its constitutionality . . . .' " (*In re Marriage Cases*

---

[1]     We are not persuaded by the quite recent decision in *United States v. Bagdasarian* (9th Cir. July 19, 2011, No. 09-50529) ___ F.3d ____[2011 U.S. App. Lexis 14684], in which the United States Court of Appeals for the Ninth Circuit concluded that in *Virginia v. Black*, *supra*, 538 U.S. 343, the high court held that every statute criminally punishing threats must include as an element of proof the defendant's subjective intent to make a threat.

(2008) 43 Cal.4th 757, 800, fn. 21; see *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 846; see also *In re Smith* (2008) 42 Cal.4th 1251, 1269 [our "common practice" is to employ this statutory construction device, " 'when reasonable, to avoid difficult constitutional questions' "].)  Therefore, to ensure the constitutionality of section 140(a), we construe it as applying only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, "a serious expression of an intent to commit an act of unlawful violence" (*Virginia v. Black*, *supra*, 538 U.S. at p. 359), rather than an expression of jest or frustration.  The latter category carries First Amendment protection; the former does not.  (*Virginia v. Black*, at p. 359.)  So construed, section 140(a) does not violate the First Amendment.

We also reject defendant's contention that section 140(a) violates the First Amendment because it lacks any requirement that the threat to harm a crime witness or victim is to be carried out *immediately* or that the defendant have the *apparent ability* to carry it out.  In support, defendant cites *United States v. Kelner* (2d Cir. 1976) 534 F.2d 1020.  In that case, a federal appeals court held that under the First Amendment "only unequivocal, unconditional and specific expressions of intention *immediately to inflict injury* may be punished" as threats.  (*Kelner*, at p. 1027, italics added.)  The *Kelner* opinion, however, was issued almost three decades before, and appears to conflict with, the United States Supreme Court's 2003 decision in *Virginia v. Black, supra*, 538 U.S. 343.  Nothing the high court said there suggests that speech threatening bodily harm is entitled to First Amendment protection, and thus is immune from criminal prosecution, absent proof that the speaker intended to inflict the threatened harm immediately, or had the apparent ability to do so.

10

## CONCLUSION AND DISPOSITION

Although the Court of Appeal rejected defendant's First Amendment challenge to section 140(a), it did so on grounds that differ from those we have articulated here.  Accordingly, we reverse the judgment of the Court of Appeal, and we remand this case to that court to consider whether our holding affects the judgment of conviction.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
ZELON, J.*

---

\*     Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY BAXTER, J.**

The First Amendment allows states "to ban a 'true threat.' " (*Virginia v. Black* (2003) 538 U.S. 343, 359 (*Black*).)  The majority opinion, which I have joined, is consistent with the First Amendment.  It upholds the constitutionality of Penal Code section 140, subdivision (a), on the ground that the statute applies "only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence.' " (Maj. opn*., ante*, at p. 10, quoting *Black*, *supra*, 538 U.S. at p. 359.)  I write separately to discuss more fully the Ninth Circuit's mistaken belief that a "true threat" requires something else, namely, proof that the speaker *subjectively* intended the statements be taken as a threat.  (See *United States v. Bagdasarian* (9th Cir. No. 09-50529, July 19, 2011) ___ F.3d ___, ___ [2011 U.S.App. LEXIS 14684, pp. *11-16]; *United States v. Cassel* (9th Cir. 2005) 408 F.3d 622, 631-633.)

As this court's opinion points out, decisions prior to *Black* " 'almost uniformly' " applied an objective standard, not a subjective standard, to determine whether a statement was a true threat and thus outside of the protections afforded by the First Amendment.  (Maj. opn., *ante*, at p. 5; see also *Doe v. Pulaski County Special Sch. Dist.* (8th Cir. 2002) 306 F.3d 616, 622 (en banc) ["All the courts to have reached the issue have consistently adopted an objective test that focuses on

1

whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm"].)  To construe *Black* as upsetting the legal landscape would be a peculiar reading.   *Black* did not criticize the existing case law.  Indeed, it did not even purport to announce what criminal intent was constitutionally required.  (Strasser, *Advocacy, True Threats, and the First Amendment* (2011) 38 Hastings Const. L.Q. 339, 377.)  Rather, *Black* involved a criminal statute that expressly *included* a showing of subjective intent—i.e., a Virginia statute banning cross burning with " 'an intent to intimidate a person or group of persons.' " (*Black*, *supra*, 538 U.S. at p. 347, quoting Va. Code Ann., § 18.2-423.)  The constitutional necessity of such a provision was never at issue.

Rather, the controversy in *Black* centered on an additional provision of the Virginia criminal statute under which " 'any . . . burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons.' " (*Black*, *supra*, 538 U.S. at p. 363 (plur. opn. of O'Connor, J.) [quoting Va. Code Ann., § 18.2-423].)  Because of the prima face provision, the jury was instructed that " '[t]he burning of a cross, by itself, is sufficient evidence from which you may infer the required intent.' " (*Id*. at p. 364 (plur. opn. of O'Connor, J.).)  A historical survey of cross burning, however, called into question the validity of the prima facie provision and the corresponding instruction.  Having originated as a means for Scottish tribes to signal each other, cross burning in the United States had become "inextricably intertwined with the history of the Ku Klux Klan" as "a 'symbol of hate.' " (*Id*. at pp. 352, 357.)  Even so, a burning cross can convey both a political message or a threatening one.   (*Id*. at p. 357.)  A burning cross may stand at times as "a symbol of shared group identity and ideology" at Ku Klux Klan gatherings (or in movies depicting the Klan), or it may blaze as "a tool of intimidation and a threat of impending violence." (*Id*. at pp. 354, 356.)

2

Because of this dual history, "a burning cross does not inevitably convey a message of intimidation" (*id*. at p. 357)—or, in other words, a burning cross is not inevitably a true threat. Something more would be required to make it a true threat.

One "type of true threat," according to the high court, occurs "where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." (*Black*, *supra*, 538 U.S. at p. 360.) Although "some cross burnings fit within this meaning of intimidating speech, and rightly so" (*ibid*.), "[t]he prima facie evidence provision in [*Black*] ignores all of the contextual factors that are necessary to decide whether a particular cross burning is intended to intimidate." (*Id*. at p. 367 (plur. opn. of O'Connor, J.).) The plurality then concluded: "The First Amendment does not permit such a shortcut." (*Ibid*. (plur. opn. of O'Connor, J.); see also *id.* at p. 380 (conc. & dis. opn. of Scalia, J.) [the jury instruction made it "impossible to determine" whether the verdict rested on the entirety of the evidence, "*including* evidence that might rebut the presumption that cross burning was done with an intent to intimidate," or whether the jury instead "focused exclusively on the fact that the defendant burned a cross"].) Indeed, "the prima facie provision strips away the very reason why a State may ban cross burning with the intent to intimidate. . . . The provision permits the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of the cross burning itself"—even when the conduct is "core political speech" and, hence, not a true threat. (*Id*. at p. 365 (plur. opn. of O'Connor, J.).)

Penal Code section 140, subdivision (a), by contrast, applies only to true threats, not to speech protected by the First Amendment. As our opinion today explains, section 140, subdivision (a), applies "only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious

3

expression of an intent to commit an act of unlawful violence.' " (Maj. opn., *ante*, at p. 10, quoting *Black*, *supra*, 538 U.S. at p. 359.) Under these circumstances, there need not be any additional showing that the speaker *subjectively* intended the statements be taken as a threat. The need to punish true threats—i.e., to " 'protect[] individuals from the fear of violence' and 'from the disruption that fear engenders' " (*Black*, *supra*, 538 U.S. at p. 360)—is triggered when a *reasonable listener* would understand the statements, in context, to be a serious expression of an intent to commit an act of unlawful violence. The fear of violence and the accompanying disruption such fear may cause is in no way diminished by the possibility that the speaker subjectively (and silently) did not intend to make a threat. And *Black* did not hold otherwise.

Our ruling today is consistent with the understanding of most courts that have considered the issue since *Black* was decided. (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 539 [*Black* does not require the defendant have "an intent that a statement 'be received as a threat' "]; *United States v. Armel* (4th Cir. 2009) 585 F.3d 182, 185 ["Statements constitute a 'true threat' if 'an ordinary reasonable recipient who is familiar with the[ir] context . . . would interpret [those statements] as a threat of injury' "]; *United States v. Jongewaard* (8th Cir. 2009) 567 F.3d 336, 339, fn. 2 ["In this circuit, the test for distinguishing a true threat from constitutionally protected speech is whether an objectively reasonable recipient would interpret the purported threat 'as a serious expression of an intent to harm or cause injury to another' "]; *Porter v. Ascension Parish Sch. Bd.* (5th Cir. 2004) 393 F.3d 608, 616 ["Speech is a 'true threat' and therefore unprotected if an objectively reasonable person would interpret the speech as a 'serious expression of an intent to cause a present or future harm.' The protected status of the threatening speech is not determined by whether the speaker had the subjective intent to carry out the threat; rather, to lose the protection of the First Amendment

4

and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person." (fns. omitted)]; *United States v. Zavrel* (3d Cir. 2004) 384 F.3d 130, 136; *United States v. Nishnianidze* (1st Cir. 2003) 342 F.3d 6, 14-15 ["A true threat is one that a reasonable recipient familiar with the context of the communication would find threatening"; thus the government had to prove only "that the defendant intended to transmit the interstate communication and that the communication contained a true threat"]; *United States v. Syring* (D.D.C. 2007) 522 F.Supp.2d 125, 129 ["courts in all jurisdictions consider whether a reasonable person would consider the statement a serious expression of an intent to inflict harm"]; *New York ex rel. Spitzer v. Cain* (S.D.N.Y. 2006) 418 F.Supp.2d 457, 479 ["The relevant intent is the intent to communicate a threat, not as defense counsel maintains, the intent to threaten"]; *Citizen Publ'g Co. v. Miller* (Ariz. 2005) 115 P.3d 107, 114 [under Arizona's test, which is "substantially similar" to *Black*, " 'true threats' are those statements made 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of [a person]' "]; *People v. Stanley* (Colo. 2007) 170 P.3d 782, 789 ["*Black* does not hold that subjective intent to threaten must be proved"]; *State v. Deloreto* (Conn. 2003) 827 A.2d 671, 680 ["In the context of a threat of physical violence, 'whether a particular statement may properly be considered to be a threat is governed by an objective standard— whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault' "]; *Hearn v. State* (Miss. 2008) 3 So.3d 722, 739, fn. 22 ["The protected status of threatening speech is not based upon the subjective intent of the speaker"]; *State v. Johnston* (Wn. 2006) 127 P.3d 707, 710

5

[" '[W]hether a true threat has been made is determined under an objective standard that focuses on the speaker' "]; see generally Citron, *Cyber Civil Rights* (2009) 89 B.U. L.Rev. 61, 107, fn. 321 ["Only the Ninth Circuit requires proof that the defendant subjectively intended to threaten the victim"].)

Thus, when the high court said, " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to particular individual or group of individuals" (*Black*, *supra*, 538 U.S. at p. 359), it did not thereby, for the first time, require proof that the speaker subjectively intended the speech be taken as a threat. The relevant intent remains the intent to *communicate*, not the intent to threaten. (*Porter v. Ascension Parish School Bd.*, *supra*, 393 F.3d at pp. 616-617.) A reading of *Black* that recasts " 'means to communicate' " into a requirement that the speaker "intended for his language to *threaten* the victim" (*United States v. Cassel*, *supra*, 408 F.3d at p. 631) assumes that the single word "communicate" was designed to overrule the settled law discussed above, and assigns "communicate" much more work than the word ordinarily can bear. Moreover, the high court, in the same paragraph in *Black*, went on to say that the "prohibition on true threats 'protects individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " (*Black*, *supra*, 538 U.S. at p. 360.) The need for such protection, as noted above, does not depend on whether the speaker *subjectively* intended to threaten the victim. "A standard for threats that focused on the speaker's subjective intent to the exclusion of the effect of the statement on the listener would be dangerously underinclusive with respect to the first two rationales for the exemption of threats from protected speech." (*New York ex rel. Spitzer v. Cain*, *supra*, 418 F.Supp.2d at p. 479.)

6

One might also question the logic of resting the constitutional determination whether speech qualifies as a true threat on the *subjective* understanding of the speaker, without regard to whether the speech objectively would be viewed as threatening. (See *United States v. Bagdasarian*, *supra*, ___ F.3d at p. ___ [2011 U.S.App. LEXIS 14684, pp. *11-12 & fn. 14].) A statement that is subjectively intended to be a threat but which presents no objective indicators of its threatening nature would not trigger fear in the recipient or cause disruption. Indeed, such speech is unlikely ever to come to the attention of law enforcement. (See *People v. Parson* (2008) 44 Cal.4th 332, 346 [" ' " 'intent may be inferred from words, acts, and other *objective* facts' " ' "].)

In short, the subjective standard created by the Ninth Circuit is both mistaken, in that it purports to define what is a true threat for federal constitutional purposes, and dangerous, in that it compromises the government's ability to protect individuals from the fear of violence and the disruption that fear engenders. California has good reason for adopting the objective standard, the standard already used in many other jurisdictions. I therefore join the opinion of the court authored by Justice Kennard.

BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

7

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Lowery

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 180 Cal.App.4th 630
**Rehearing Granted**

_____

**Opinion No.** S179422
**Date Filed:** August 11, 2011

_____

**Court:** Superior
**County:** Riverside
**Judge:** John G. Evans

_____

**Counsel:**

William D. Farber, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steven T. Oetting, Gil Gonzalez and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William D. Farber
P.O. Box 2026
San Rafael, CA  94912-2026
(415) 472-7279

Christine Levingston Bergman
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2247