Filed 11/10/25  P. v. Lopez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO LOPEZ, JR.,<br><br>      Defendant and Appellant. | A171538<br><br>(Mendocino County<br>Super. Ct. No. 24CR03523) |

A jury found defendant Antonio Lopez, Jr., guilty of deterring an officer with threats of violence, vehicle theft, driving under the influence of alcohol, and failure to stop at the scene of an accident.  Defendant argues his conviction of deterring an officer must be reversed because his statement to the officer did not constitute a "true threat" as required under the First Amendment.  He also claims insufficiency of the evidence to support his convictions of deterring an officer and vehicle theft and ineffective assistance of counsel based on his trial counsel's failure to request an instruction on voluntary intoxication.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Shawn Ciapusci owns a CAT excavator, which he estimates is worth at least $30,000.  On January 27, 2024, the excavator was parked in the

1

backyard of his stepfather Gregory Hall's house in Hopland in Mendocino County.

That afternoon, Hall's neighbors observed defendant operating Ciapusci's excavator. After hearing a horn beeping, Angela Myers went to the road and saw defendant "hitting the ground with [the bucket of the excavator] and making the excavator buck up and swing the bucket around" near her RV. Robert Perotti described defendant "being loud and not knowing what [he was] doing on such a piece of equipment." Both witnesses observed defendant back the excavator into a power pole and fence, damaging the fence.

After backing into the pole and fence, defendant walked away from the excavator, and Myers followed him by foot. According to Myers, defendant walked into his apartment "and walked out like he was a different person and said, 'Why are you here? I just woke up. I don't know what you're talking about.'"

Ciapusci did not know defendant and had not given him permission to drive the excavator.

California Highway Patrol Officer Matthew Neisse was dispatched to the area and found defendant in the parking lot of his apartment complex. Defendant, who smelled of alcohol, "immediately became argumentative and defensive with" Neisse. Defendant refused to answer questions and was yelling. Because Neisse was alone, he detained defendant in handcuffs for his safety. Neisse spoke with Myers, who reported that defendant had been driving the excavator. Another officer, Officer Pierce, arrived, and Neisse placed defendant under arrest for driving under the influence (DUI). In defendant's pocket, Neisse found a small black key with "Cat" printed on it.

Officer Neisse tried to place defendant in his patrol car, but defendant "was being resistive and aggressive and was thrashing himself back and forwards." Defendant's thrashing "jammed [Neisse's] thumb, which bent . . . back almost to the point where [Neisse] thought it was broken." Officer Pierce tried to assist Neisse in gaining control of defendant, but defendant used his foot to brace himself against the door of the patrol car and "then used his shoulder and his head to brace himself against the door frame of the patrol vehicle to prevent [the officers] from putting him inside."

Officer Neisse explained "implied consent" to defendant, but defendant refused to take either a breath test or a blood test.[1] Neisse obtained a search warrant to conduct a blood draw. Because of the difficulty in getting defendant into a patrol car, the officers requested an additional unit with "a cage" to transport defendant to the hospital for the blood test.

Officer Scott Baker responded to the request for a caged patrol vehicle. According to Baker, defendant was "very unruly" and "using profanities, yelling," his "behavior was erratic, irrational at times," and he smelled strongly of alcohol. Baker took defendant to the hospital for a blood draw, and defendant was argumentative, loud, and abrasive during the drive. Baker remained at the hospital with defendant for around two hours. Defendant continued to yell and use profanities, and his "behavior deteriorated to the point" he was placed in a hospital room because "[t]he

---

[1] "A person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested for an offense allegedly committed in violation of" certain offenses involving driving under the influence. (Veh. Code, § 23612, subd. (a)(1)(A).) Officer Neisse read to defendant verbatim the "chemical test admonition" of Department of Motor Vehicles form DS 367.

3

nurses' station did not like him disturbing the general flow of business." Defendant "was verbally aggressive with just about everybody he contacted, including the nurses, staff, and hospital security, and the doctors."

After the blood draw, defendant was placed in handcuffs, and Baker and another officer attempted to walk him from the hospital room to Baker's patrol car to be taken to county jail. At that point, defendant "made a threat to [Baker] that when these cuffs come off he was going to knock [him] out onto a bed."[2] Defendant was "tensed up," his voice was loud, and he looked right at Baker when he made this statement. Baker understood defendant's statement as a threat of physical violence against him.[3] Defendant "was pulling back and forward and from side to side and did not want to be walked out of the room. But given his erratic behavior, [the officers thought] it was prudent to maintain control of him because [they] didn't want him to run down the hallway or try and run away."

Test results of the blood sample taken at the hospital showed defendant's blood alcohol content was .23 percent, an amount that would cause physical and mental impairment.

The Mendocino County District Attorney charged defendant with resisting or deterring an officer (Pen. Code,[4] § 69, subd. (a); count 1), taking a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a); count 2), misdemeanor driving under the influence of alcohol (*id*., § 23152, subd. (a);

---

[2] According to Officer Neisse, who was also present at the hospital, defendant "looked at Officer Baker and told him, 'Take these cuffs off and I'll knock you the fuck out on this bed.' "

[3] Officer Neisse also interpreted defendant's statement as a threat. When defendant made the statement, his demeanor was hostile and "he was actively resistive, trying to pull away from Officer Baker to walk on his own."

[4] Undesignated statutory references are to the Penal Code.

4

count 3), and misdemeanor failure to stop at the scene of an accident (*id.*, § 20002, subd (a)(1); count 4). As to count 3, it was alleged, first, defendant had a prior conviction of DUI and, second, he failed to submit to a chemical test pursuant to Vehicle Code section 23577, subdivision (a)(1). Various aggravating circumstances were also alleged.

Following a jury trial in May 2024, defendant was found guilty of all four counts and the special allegation that he willfully refused to submit to a chemical test was found to be true. In a subsequent court trial, the trial court found defendant had a prior DUI conviction[5] and found four circumstances in aggravation.

The trial court imposed an aggregate sentence of three years and eight months, consisting of an upper term of three years for count 1 and a consecutive eight months (one-third the middle term) for count 2.

## DISCUSSION

A. *Constitutional Claim*

Defendant contends his conviction under section 69 (count 1) violates the First Amendment because his statement to Officer Baker did not constitute a "true threat."

Under section 69, subdivision (a), it is a crime to "attempt[ ], by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law."

"The First Amendment states that 'Congress shall make no law . . . abridging the freedom of speech.' (U.S. Const., 1st Amend.) This proscription, as incorporated through the Fourteenth Amendment's due process clause, likewise binds the states. [Citation.] The provision is not

---

[5] Defendant agreed that the trial court could determine this allegation and further stipulated that he had a prior conviction for a DUI from 2019.

5

absolute, however. Not within the First Amendment's protection are 'certain well-defined and narrowly limited classes of speech' . . . [including] what the United States Supreme Court has described as 'true threats.' " (*People v. Lowery* (2011) 52 Cal.4th 419, 423, quoting *Virginia v. Black* (2003) 538 U.S. 343, 358, 359.)

" 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " (*Virginia v. Black*, *supra*, 538 U.S. at pp. 359–360.)

Thus, to comport with the First Amendment, a conviction under section 69 based on threatening speech requires a " 'true threat.' " (*People v. Smolkin* (2020) 49 Cal.App.5th 183, 188 (*Smolkin*).)

"We make 'an independent examination of the record' in determining whether 'the speech at issue is an unprotected true threat.' [Citation.] Nevertheless, '[b]ecause the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue.' " (*Smolkin, supra*, 49 Cal.App.5th at p. 188.) When the material facts are not in dispute, "we must make an independent legal determination whether a 'reasonable listener would understand' " the threatening statement "to constitute ' "a serious expression of an intent to commit an act of unlawful violence" ' 'in light of the context and surrounding circumstances.' " (*Ibid.*)

6

After independently examining the record, we conclude a reasonable listener would understand defendant's threat to Officer Baker as a serious expression of an intent to commit an act of unlawful violence under the circumstances of this case. When he was arrested, defendant was aggressive and resisted being placed in a patrol car, "thrashing himself back and forwards," jamming Officer Neisse's thumb and using his foot, shoulder, and head to brace himself and keep the officers from putting him in the patrol car. Over the course of hours, Baker observed defendant being very unruly, erratic, argumentative, and abrasive. When defendant made the threat to knock Baker out, he was "tensed up" and loud and looked directly at Baker. Around that time, defendant was also "pulling back and forward and from side to side and did not want to be walked out of the room" to be transported to jail. Baker reasonably understood defendant's statement as a threat of unlawful physical violence.

Defendant argues his statement that he would knock Baker out when his cuffs were off was "intrinsically unachievable and, therefore, meaningless." We are not persuaded. First, " 'present ability to carry out threats is not required if . . . the target of the threat could reasonably fear retaliatory action on some future occasion.' " (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 195.) Second, Officer Baker already knew that two officers had requested a caged patrol car for defendant because he physically resisted getting in a regular patrol car, and Baker had observed defendant's erratic and aggressive behavior at the site of arrest, during transport to the hospital, and at the hospital. Defendant claims he was "merely express[ing] his view that *if* he were not handcuffed, he would be capable of physically overmatching the officer." We agree with the Attorney General, however, that a reasonable listener in this circumstance would have understood

7

defendant's threat as a serious expression of an intent to commit violence and would have "reasonably feared [defendant] might go beyond his attempt to pull away and kick, headbutt, or body slam the officer."

Next, defendant points out that he had been uncuffed during the blood draw and argues the fact he did not make the threat until after he was placed in handcuffs again shows he was not serious in making his threat. Defendant claims he "was more likely tired, frustrated, and behaving like a rude intoxicated person rather than earnestly planning to commit an act of violence against Baker." But the fact defendant did not make the threat earlier does not undermine the conclusion a reasonable listener would understand the statement as a serious expression of intent to commit violence. Defendant made the threat as he was being escorted out of the hospital for further detention, when, as the Attorney General suggests, "the reality of his imminently being taken to jail arose." We also find no inconsistency between defendant making a "true threat" and defendant also being rude, intoxicated, and frustrated.

Defendant further argues his movement of pulling back and forth and side to side when he made the threat was likely the result of impairment from intoxication, not an effort to resist. We do not find this explanation for his conduct convincing given that his ongoing physical resistance and disruptive behavior over the course of his detention had previously prevented two officers from placing him in a regular patrol car—requiring transport by a caged patrol car—and then required his placement in a private hospital room.

For the foregoing reasons, we reject defendant's constitutional challenge to his conviction under section 69.

B.    *Sufficiency of the Evidence*

Apart from his constitutional claim, defendant argues the prosecution failed to present substantial evidence supporting his felony convictions for deterring an officer and vehicle theft.

Our standard of review is well established.  (See *People v. Nishi* (2012) 207 Cal.App.4th 954, 966 [absent a First Amendment claim, a challenge to the sufficiency of evidence for a conviction of violation of section 69 is assessed under the substantial evidence test].)  " '[W]e review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . .  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87 (*Manibusan*).)

When a crime requires proof of specific intent, " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'  [Citation.]  Moreover, the standard of review that applies to insufficient evidence claims involving circumstantial evidence is the same as the standard of review that applies to claims involving direct evidence.  'We "must accept logical inferences that the jury might have drawn from the

9

circumstantial evidence. [Citation.]" [Citation.] "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*Manibusan, supra*, 58 Cal.4th at p. 87.)

1.   Count 1: Deterring an Officer from Performing Duties

Defendant claims no substantial evidence showed his statement to Officer Baker was an attempt to deter the officer from performing his legal duties. We disagree.

Viewed in the light most favorable to the prosecution, the evidence showed defendant's behavior was argumentative, aggressive, and erratic from the time he was first detained until he was escorted to a patrol car to be taken to jail a few hours later. At the site of his arrest, defendant physically resisted being placed in a patrol car to be taken to the hospital for a blood draw, and his thrashing was so forceful, he caused injury to Officer Neisse's thumb. Later, when he made the threatening statement at issue, defendant looked directly at Officer Baker, he was loud and tensed up, and he was physically "pulling back and forward and from side to side." From these circumstances, a trier of fact reasonably could infer that defendant's threat was an attempt to deter Baker from performing his legal duty of taking defendant to a patrol car and then to jail following arrest.

In support of his claim, defendant argues his statement, "Take these cuffs off and I'll knock you the fuck out on this bed," merely expressed his

10

opinion that he could overpower Officer Baker if his handcuffs were removed and was not an actual attempt to deter the officer. But a trier of fact could reasonably determine the threat was more than a mere statement of opinion based on the circumstances that defendant had been combative with officers and hospital staff over the course of hours, his prior thrashing had injured an officer, and his physical movements around the time of the threat appeared to impede the officers in transporting defendant to jail.

Defendant asserts, "[S]ubstantial evidence showed [his] threat was not an attempt to deter Baker from performing his legal duties when he made this threat." However, showing the evidence may reasonably be reconciled with a finding of not guilty does establish there was no substantial evidence supporting the jury's finding of guilt. (See *Manibusan*, *supra*, 58 Cal.4th at p. 87.) We do not reverse a conviction based on insufficiency of the evidence unless defendant shows " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Ibid*.)

Next, defendant contends there was insufficient evidence he had the requisite specific intent when he threatened Officer Baker. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153 ["a violation of section 69 requires a specific intent to interfere with the executive officer's performance of his duties"].) He argues that, given his high level of intoxication, his statement could *only* be interpreted as "a foolish remark while three sheets into the wind." Again, we disagree.

Viewed in the light most favorable to the prosecution, the evidence supported a determination that defendant did not want to be arrested, did not want to submit to a blood test, and did not want to be transported to jail. These circumstances, in turn, support the reasonable inference that, when he made the threat to Officer Baker, defendant harbored a specific intent to

11

deter the officer from performing his legal duty to transport defendant from the hospital to jail.

    2.    <u>Count 2: Vehicle Theft</u>

Under Vehicle Code section 10851, subdivision (a), "Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle" is guilty of a crime. "A violation of this section requires proof of a specific intent to deprive the owner of the car of possession or title for either a temporary or permanent period. [Citation.] . . . [T]he People [must] show by direct or circumstantial evidence the defendant lacked the consent of the owner. [Citation.] Mere possession of a stolen car under suspicious circumstances is sufficient to sustain a conviction of unlawful taking." (*People v. Clifton* (1985) 171 Cal.App.3d 195, 199.)

Here, the testimony of two witnesses who observed defendant operating the excavator, together with the owner's testimony that he did not give defendant permission to drive his excavator, provided substantial evidence supporting the jury's verdict that defendant committed vehicle theft.[6]

Defendant argues the evidence that his blood alcohol content was .23 percent and a criminalist's testimony that a person with this level of intoxication "would have a hard time listening to instructions and following instructions" negates any inference that defendant harbored specific intent to deprive the owner of possession of his vehicle. But, again, the fact that a reasonable jury could have reached " 'a contrary finding does not warrant the judgment's reversal.' " (*Manibusan, supra*, 58 Cal.4th at p. 87.) The test is

---

    [6] There is no dispute the excavator qualifies as a vehicle.

12

whether " ' "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Ibid*.) Defendant has not met this standard. The record contains substantial evidence supporting his conviction of vehicle theft even if a reasonable trier of fact could have reached a different conclusion.

C.    *Claim of Ineffective Assistance of Counsel*

Section 29.4, subdivision (a), provides: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act."

Subdivision (b) of the statute provides that "evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent." As we have seen, deterring an officer and vehicle theft are specific intent crimes. (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1153; *People v. Clifton*, *supra*, 171 Cal.App.3d at p. 199.) A jury may be instructed on voluntary intoxication when there is "evidence from which a reasonable jury could conclude defendant's mental capacity was so reduced or impaired as to negate the required criminal intent." (*People v. Marshall* (1996) 13 Cal.4th 799, 848.)

Defendant contends his trial counsel was ineffective in failing to request a jury instruction on voluntary intoxication.

To establish ineffective assistance of counsel, a defendant must "show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms" and

13

"resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  In assessing a claim of ineffective assistance, we defer "to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.  It is particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

Here, the record does not disclose why trial counsel did not request an instruction on voluntary intoxication.  The Attorney General suggests at least two plausible explanations for counsel's choice.  First, trial counsel reasonably may have believed the instruction was unwarranted because the evidence did not show "defendant's mental capacity was so reduced or impaired as to negate the required criminal intent" (*People v. Marshall*, *supra*, 13 Cal.4th at p. 848).  Second, "defense counsel could have made a tactical decision to refrain from requesting the instruction because his goal was to obtain acquittal on all counts," including driving under the influence, and he "may reasonably have feared that an instruction on voluntary intoxication could focus the jury's attention on [his] high level of intoxication . . . ."

Defendant did not file a reply brief in this appeal and therefore offers no response to these suggestions.  On this record, we cannot say there could

14

be no rational tactical purpose for trial counsel's conduct.  Accordingly, defendant's claim of ineffective assistance of counsel fails on direct appeal.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Richman, Acting P.J.

_____
Desautels, J.

A171538, *People v. Lopez*

15