Filed 7/9/25  P. v. Bringazi CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA KENNETH BRINGAZI,<br><br>    Defendant and Appellant. | H051912<br>(Santa Clara County<br>Super. Ct. No. C2007410) |

A jury convicted defendant Joshua Kenneth Bringazi of stalking and other offenses related to a pattern of conduct toward a woman we will refer to as T.P. Defendant was sentenced to four years in prison.  Defendant argues his stalking conviction must be reversed for insufficient evidence supporting the jury's implicit findings that he made a credible threat and that he did so with the intent to place T.P. in reasonable fear for her safety.  Defendant also argues the trial court admitted unduly prejudicial testimony about uncharged conduct that was not admissible under Evidence Code section 1101, subdivision (b).  For the reasons explained here, we will affirm the judgment.

## I.    TRIAL COURT PROCEEDINGS

The operative first amended information charged defendant with kidnapping (Pen. Code, § 207, subd. (a); count 1); stalking (Pen. Code, § 646.9, subd. (a); count 2); dissuading or attempting to dissuade a witness (Pen. Code, § 136.1, subd. (c)(1); count 3); and misdemeanor invasion of privacy using an electronic device (Pen. Code,

§ 637.7, subd. (a); count 4).  (Unspecified statutory references are to the Penal Code.)
All counts relate to the same victim, T.P.  The information also alleged defendant had one
prior strike conviction (§ 1170.12, subd. (b)(1)); one prior serious felony conviction
(§ 667, subd. (a)(1)); had served a prior prison term; and was on parole at the time of the
charged offenses.

## A. TRIAL EVIDENCE

### 1. Testimony of T.P.

T.P. met defendant in late 2019 or early 2020 while she was working at a tanning
salon in Campbell.  They exchanged phone numbers and began socializing.  At the time
she met defendant, T.P. was seeing another man, A.C.  Defendant wore an ankle monitor,
and told T.P. it was because of "an incident that happened with the 14-year-old girl, but
he did his time."  That made T.P. "[e]xtremely uncomfortable," but she continued to
spend time with him.

Defendant and T.P. kissed on one occasion, while attending a San Jose Sharks
game.  Defendant would refer to T.P. as "babe or honey," but she made clear that she did
not want a relationship with him.  Defendant started buying her gifts, mainly clothing.

T.P. described a trip she took with defendant to Half Moon Bay in April 2020.  He
asked her to meet him at a CVS.  Defendant was driving an RV, which T.P. had not seen
before.  She testified on direct examination that she was surprised defendant arrived in an
RV because she thought they were planning to go to the beach, have dinner, and return
home.  (On cross-examination, she acknowledged having received a text message from
defendant before the trip that promised her an overnight "glamping" trip.)  T.P. started
feeling uncomfortable as they drove to the beach.  She told defendant she wanted to go
home.  Defendant "calmed [her] nerves and said, Okay, when we're done here."  T.P.
drank wine during the drive, and defendant drank beer.  Defendant parked the RV along
the highway in an area overlooking the ocean.  He continued to serve T.P. wine as he
made dinner.  She repeatedly told him she wanted to go home, estimating that she made

2

the request about 50 times. She initially asked politely. He responded, "You'll go home when you go home, when I'm ready." She then became more assertive, "and that's when he just started getting more aggressive with his words, reassuring me that I wasn't going home anytime soon." T.P. was afraid that defendant might harm her because she did not know his intentions. She did not feel free to leave because she did not think he would let her. She could not see outside because the blinds were down and defendant had placed a cover on the windshield.

T.P. texted her mother and A.C. that she was scared and wanted to come home. She sent her location to A.C., and he drove to pick her up within 30 minutes. Defendant became angry when T.P. told her A.C. was coming to pick her up. Defendant kept saying, " 'I'm not done. You're not leaving.' " Defendant put his hand on the RV's side door so that she could not leave. She believed defendant would not let her out of the RV. A.C. arrived and texted T.P. She told defendant she was leaving and tried to open the door, but it was stuck or jammed. Defendant then got in the driver's seat and started driving, saying something like A.C. "can chase us or he has to wait." Defendant stopped the RV after about a minute, and T.P. managed to open the door and get out. She ran to A.C.'s car and got in. Defendant approached the driver's side of A.C.'s car with a baseball bat raised in his hand within striking distance of the car. Defendant told A.C. he knew where he lived, and named the street. A.C. drove away with T.P., and defendant walked back to his RV. T.P. returned to her mother's house near Campbell where she was living at the time. Someone called the police about 30 minutes after T.P. returned home because T.P.'s mother noticed a shadow outside a window. (A.C. testified that he went outside that night and saw defendant's RV parked on the "next street over" from the house.)

Defendant tried to communicate with T.P. after the Half Moon Bay incident via social media and text messages. He messaged her from multiple social media accounts for the next week. She told him to leave her alone. She blocked defendant's phone

3

number and social media accounts. He sent her an email with a video around Mother's Day, in which a country music singer wished her a happy birthday on behalf of defendant.

T.P. saw defendant outside her house about two weeks after the Half Moon Bay incident. She woke up around 2:00 or 3:00 a.m., looked out the window, and saw defendant walking toward the house. She ran to her bathroom, and then saw defendant drive away.

T.P. and A.C. started staying at hotels around the beginning of May 2020 because T.P. no longer felt safe at home. They initially stayed at a Courtyard hotel in Campbell. Someone called the front desk looking for T.P. and hung up when she answered. Only A.C. knew she was staying at the hotel, and he confirmed he had not made the call. T.P. and A.C. then moved to a Double Tree hotel in Campbell. They asked hotel staff not to tell anyone their room number.

### 2. Double Tree Employee Testimony

The person who had been the Double Tree's general manager in May 2020 testified that defendant came to the front desk one evening around 7:00 p.m. Defendant said his friend was staying at the hotel on the third floor, which the manager thought was odd because the rooms on the third floor were being renovated. A man called the front desk soon thereafter from a house phone on the third floor, asking to be connected to a room where someone with T.P.'s last name was staying. The manager asked another employee to investigate why a call was coming from the third floor.

The employee testified that he checked the third floor at the manager's request but did not see anyone. The employee went to the second floor, where he saw defendant pushing hotel doors to see if they would open. The employee asked defendant if he needed help. Defendant shook his head "no" and walked away quickly. Around 8:00 the next morning, the employee saw defendant leaving an elevator and followed him. Defendant ran away, and the employee called the police.

4

### 3. Police Investigation

A former Campbell police officer described responding to a call at the Double Tree hotel the same day the hotel employee called the police. He went to T.P.'s room, where another officer was already present. T.P. seemed scared and nervous. Based on her description of defendant's behavior, the officer suspected that there might be a tracking device on T.P.'s car. The officer went with A.C. to inspect T.P.'s car and found a GPS tracking device attached to the car frame underneath the front passenger seat. (The device was later analyzed for fingerprints, and two samples matched defendant.) In a later search of defendant's RV, the officer found another GPS tracker of the same brand as the one found on T.P.'s car.

### 4. Uncharged Conduct Involving Another Woman

Two witnesses testified over defense objection about defendant entering their parents' home in 2006. One testified that she was 17 years old in 2006. She had communicated with defendant on social media and had met him in person once. The woman recalled that she and her step-brother returned home one evening to find the front door ajar. They walked in and heard a sliding door open. Her brother testified he heard someone running toward an outdoor patio, so he followed the sound and found defendant hiding in a corner. Although defendant said he was there to see the woman, they had not made plans to meet. Defendant then left the house on foot. The woman noticed around $30 in cash was missing. She also noticed her laptop was open and running, and someone had opened photographs of her on the computer. After the incident was reported to the police, defendant called the woman and asked her "how much will it take to drop this?"

## B. VERDICTS AND SENTENCING

The jury found defendant not guilty of kidnapping (count 1), but found him guilty of the lesser included offense of false imprisonment. The jury found defendant guilty of stalking (count 2) and invasion of privacy (count 4). The jury found defendant not guilty

5

of dissuading a witness (count 3).  In a bifurcated trial on special allegations, the jury found true allegations that defendant had a prior strike conviction, had served a prior prison term, and was on parole when he committed the offenses.  (The jury was not asked to decide whether defendant had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a).)

The trial court denied defendant's motion to strike his prior strike conviction under *People v. Superior Court (Romero)* 13 Cal.4th 497.  The court sentenced defendant to four years in prison (the middle term of two years for stalking (§ 646.9, subd. (a)), doubled for the prior strike conviction (§ 1170.12, subd. (c)(1))) and concurrent sentences on the misdemeanor convictions.

## II.    DISCUSSION

### A. Sufficient Evidence Supports the Stalking Conviction

The elements of stalking are:  (1) repeatedly following or willfully and maliciously harassing another person; (2) making a credible threat; and (3) intending to place the person in reasonable fear for their safety.  (§ 646.9, subd. (a).)  A "credible threat" is defined to include not only an overt threat but also a "threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct." (*Id.*, subd. (g).)  Although constitutionally protected activity is not included in the definition of "credible threat" (*ibid.*), "[t]rue threats of violence are outside the bounds of First Amendment protection and punishable as crimes." (*Counterman v. Colorado* (2023) 600 U.S. 66, 69.)

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)  When a challenged finding implicates the First Amendment, we exercise our independent judgment to determine whether the defendant's communication or

6

expressive conduct is entitled to First Amendment protection. (*People v. Peterson* (2023) 95 Cal.App.5th 1061, 1066–1067; citing *In re George T.* (2004) 33 Cal.4th 620, 630.) But independent review "is applicable only to issues that could implicate the First Amendment, such as the content of appellant's communications; sufficiency of the evidence to support the jury's finding on intent is determined according to the usual substantial evidence standard." (*People v. Lopez* (2015) 240 Cal.App.4th 436, 447.)

### 1. Evidence of a Credible Threat

Defendant's pattern of conduct, considered as a whole, supports a finding that he made a credible threat toward T.P. During the Half Moon Bay incident, defendant refused T.P.'s repeated requests to take her home. He became angry when she told him A.C. was picking her up. He told her, "You're not leaving," he put his hand on the RV door to keep her from opening it, and then drove away with her inside the RV and trying to open the door. After T.P. was able to open the door and run to A.C.'s car, defendant brandished a baseball bat and came within striking distance of the car while telling A.C. he knew where he lived. Defendant thereafter came to T.P.'s residence on multiple occasions; repeatedly tried to communicate with her via social media and text message; placed a GPS tracking device on T.P.'s car; and came to a hotel where she was staying. A rational trier of fact could conclude the foregoing pattern of conduct amounted to a credible threat intended to place T.P. in reasonable fear for her safety.

Defendant argues his conduct "did not communicate or imply 'a serious expression of an intent to commit an act of unlawful violence.' " (Quoting *People v. Lowery* (2011) 52 Cal.4th 419, 427 (*Lowery*) [discussing § 140, subd. (a), which penalizes willfully threatening to "use force or violence upon the person of a witness"].) But that is the standard to determine whether something can be considered a criminal threat for First Amendment purposes; it is not the definition of a "credible threat" for purposes of the stalking statute. But even under the definition discussed in *Lowery*, substantial evidence supports such a finding. Defendant's conduct of brandishing a

7

baseball bat within striking distance of a car in which T.P. and A.C. were sitting implied a threat that he would do something violent to her or to A.C.

Defendant relies on *People v. Peterson* (2023) 95 Cal.App.5th 1061, which found insufficient evidence of stalking. "Peterson's stalking conviction rested entirely on his speech," which "unquestionably occurred in a First Amendment context, concerning a school bond measure, local politics, and criticism of a politician." (*Id.* at p. 1067.) By contrast, defendant's stalking conviction was based on a pattern of conduct coupled with an implied threat of violence through his brandishing of the baseball bat.

### 2. Evidence of Intent

A rational trier of fact could conclude that defendant intended his pattern of conduct to place T.P. in reasonable fear for her safety. As we have discussed, defendant tried to prevent T.P. from leaving the RV during the Half Moon Bay incident and brandished a baseball bat once she reached A.C.'s car. He disregarded her request to leave her alone, instead appearing multiple times at her residence and placing a GPS tracking device on her car. We are not persuaded by defendant's argument that the evidence merely "established [defendant's] intent to follow her and, presumably, contact her." That interpretation ignores our standard of review (see *Bolin*, *supra*, 18 Cal.4th at p. 331), under which we review the entire record in the light most favorable to the judgment.

### B. TESTIMONY ABOUT UNCHARGED CONDUCT

The prosecution moved in limine to admit evidence of three uncharged acts under Evidence Code section 1101, subdivision (b), two involving defendant having sexual intercourse with minors and one involving defendant's unlawful entry into a residence. The trial court denied the motion as to the sexual intercourse acts. After conducting an Evidence Code section 402 hearing, the court ultimately granted the motion as to the unlawful entry, finding it was relevant to defendant's intent in the first element of stalking—whether he intended to willfully and maliciously harass T.P. The court also

8

found the evidence would not be unduly prejudicial.  The jury was properly instructed that it could consider the evidence for the limited purpose of deciding whether "defendant acted with the intent required to prove the offense alleged in Count 2 (Stalking)."  As we have discussed, a witness testified at trial that defendant entered her family home in 2006 without permission and accessed her laptop and photos stored on the device.

### 1.  The Testimony Was Admissible Under Evid. Code, § 1101, Subd. (b)

Evidence Code section 1101, subdivision (b) makes admissible "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."  "Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent."  (*People v. Carter* (2005) 36 Cal.4th 1114, 1147–1148.)  When introduced to show similar intent, the uncharged crimes need only be sufficiently similar to the charged offenses to support the inference that the defendant " ' " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)  We review the admission of evidence under Evidence Code section 1101, subdivision (b) for abuse of discretion.  (*Carter*, at p. 1148.)

Focusing on the third element of stalking—that a credible threat be made with the intent to place the victim in reasonable fear for their safety—defendant argues a "defendant's *intent to harass* the victim is not an element of the crime of stalking."  But the first element of stalking does require the prosecution to prove that the defendant "willfully" and "maliciously" harassed the victim.  (§ 646.9, subd. (a).)  Subdivision (e) of that section defines "harass" as "engag[ing] in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the

9

person, and that serves no legitimate purpose." (*Id.*, subd. (e).) By requiring that harassment be knowing, willful, and malicious, the first element contains an intent requirement—i.e., an intent to harass as defined.

We see no abuse of discretion in finding the challenged evidence of defendant's uninvited entry into a residence sufficiently similar to the charged stalking count, supporting an inference that defendant harbored an intent to harass in each instance. Both the charged and uncharged conduct involved defendant communicating with a female victim on social media and then invading her privacy by appearing at her residence without permission.

Defendant argues that the uncharged conduct is dissimilar because defendant met the victim of that conduct only once and did not threaten or repeatedly follow or harass her. But only the "least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) We find no abuse of discretion on this record.

## 2. The Evidence Was Not Unduly Prejudicial

A trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review the trial court's decision for abuse of discretion and do not substitute our judgment for that of the trial court. (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 44)

We acknowledge that the uncharged conduct was somewhat remote in time, having occurred in 2006. But the uncharged conduct was not substantially more inflammatory conduct than the charged counts, even though defendant actually entered the victim's residence in 2006. The charged counts involved defendant repeatedly following T.P. and further invading her privacy by attaching a GPS device to her car.

10

The conduct was reasonably comparable, such that the trial court was within its discretion to find that evidence of the uncharged conduct was not unduly prejudicial.

### III.    DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Bromberg, J.

H051912
*The People v. Bringazi*