Filed 10/8/25  P. v. Paigly CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H050724 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. C21050909, C1919832) |
| v. | |
| JEREMY PAIGLY, | |
| Defendant and Appellant. | |

Defendant Jeremy Paigly was convicted by jury of attempting to dissuade a witness by threat of force, using force or threat of force against a witness, and misdemeanor sexual battery.  Defendant contends the evidence supporting the two threat-based convictions is insufficient as a matter of law.  He argues the convictions are invalid under *Counterman v. Colorado* (2023) 600 U.S. 66 (*Counterman*) because merely calling someone a "snitch" is protected speech under the First Amendment and because the jury was not required to find he subjectively intended to threaten the witness.  He also asserts that his sexual battery conviction should be reversed because the jury was not instructed he could not form the required specific intent if he was asleep during the crime.  For the reasons discussed here, we will affirm the judgment.

# I.  BACKGROUND

## A. FACTUAL SUMMARY

Joe Paigly and his wife Doe (defendant's brother and sister-in-law) were separated and living apart.[1]  After the separation, defendant had lived with Doe for a short time and they also had a sexual relationship of unspecified duration.

One morning in early February 2021, Doe saw defendant sitting in his parked car outside her house.  Defendant told her he was tired and that he had almost crashed his car.   She invited him in to take a nap and offered to make him breakfast.  Doe's 19-year-old daughter (defendant's niece) was asleep in the bed.  When Doe left to cook breakfast, defendant had lain down in the bed but was not yet asleep.

Defendant's niece woke up when defendant touched her and began "grasping" her vagina over her clothes multiple times and also asked if he could "eat [her] pussy."  The young woman did not attempt to look at or speak to defendant because she was scared and confused by his actions.  She texted her mother:  "Tell him to leave already, he's acting weird."  When Doe returned from the kitchen, her daughter was awake and defendant appeared to be sleeping.  Doe woke defendant, handed him his breakfast and told him to go eat in another part of the house.  Doe's daughter did not tell her mother what happened, but she did tell her father Joe.

Joe and Doe discussed the incident the next day.  That same day, defendant called Doe to borrow a vacuum cleaner.  Doe told defendant she and her daughter did not want to see him or want him in the house.  Defendant insisted on getting the vacuum cleaner.  Doe testified at trial that when he arrived, he looked "sad" and said to her "[t]his has to be a dream; this can't be real."  According to Doe, Joe also discussed the incident with defendant's ex-wife, who then informed defendant of that conversation.

---

[1]  We refer to Joe by his first name for clarity, without intending disrespect or familiarity.  We refer to his wife as Doe in the interest of privacy.  (Cal. Rules of Court, rule 8.90.)

Joe encouraged his daughter to report the incident to police, which she did a few weeks later. A detective interviewed her and Joe multiple times and also contacted defendant on March 22 regarding the investigation. At some point after the detective's interviews, Doe informed Joe that defendant was "looking for" him. Then on April 23, defendant found and confronted Joe who was on a sidewalk waiting for a store to open. Defendant pulled up in his car, got out and called Joe a "snitch" while holding a knife. Defendant then began to chase Joe before returning to his car and driving away. Another man who was present heard someone say the word "snitch" but could not tell who said it.

Joe ran away, afraid defendant might try to stab him. The other man also ran when he saw Joe start running and heard him say "run, run, take off." Joe then called 911. He testified at trial that defendant was holding a knife, but on the day of the incident he had reported defendant was holding a gun. Joe explained that he thought defendant had a gun because he thought the other man said defendant had a gun and because Joe knew defendant often carried a gun.

### B. PROCEDURAL HISTORY

The Santa Clara County District Attorney charged defendant by information with dissuading or attempting to dissuade a witness by use of force or threat (Pen. Code, § 136.1, subd. (c)(1); count 1 [unspecified statutory references are to this code]); making a criminal threat (§ 422, subd. (a); count 2); misdemeanor sexual battery (§ 243.4, subd. (e)(1); count 3); and using force or threatening to use force or violence upon a witness (§ 140, subd. (a); count 4). The information further alleged that defendant used a dangerous or deadly weapon, a knife, in committing counts 1 and 4 (§ 12022, subd. (b)(1)). The information also alleged five prior strike convictions and that defendant was on bail at the time of the offenses (§ 12022.1, subd. (b)).

As to the sexual battery charge, the defense argued that either defendant was asleep or only partially awake and mistakenly believed that he was touching Doe, with whom he had a sexual relationship. The defense did not seek an unconsciousness

3

instruction, but instead requested a mistake of fact instruction, which the trial court read to the jury.

Regarding the witness threatening charges, the defense argued defendant merely called Joe a "snitch," and challenged Joe's testimony that defendant had chased him with a knife. The defense focused on Joe's initial report that defendant had a gun rather than a knife, as well as differences between Joe's account and the other witness's recollection. Defendant contended Joe was lying about the weapon to retaliate for the sexual relationship between defendant and Doe.

The jury found defendant guilty of dissuading or attempting to dissuade a witness (count 1), using force or threat of force against a witness (count 4), and misdemeanor sexual battery (count 3). The jury acquitted defendant of making a criminal threat (count 2). It also found not true the deadly or dangerous weapon allegations on counts 1 and 4. After a bifurcated court trial on the prior strikes and on-bail allegation, the trial court found those allegations true.

The trial court ultimately struck all but one of defendant's prior strikes, and sentenced defendant to a total term of four years in prison, consisting of four years (the lower term, doubled) on count 1 (§ 136.1, subd. (c)(1)); and a concurrent term of four years (the lower term, doubled) on count 4 (§ 140, subd. (a)), which the court stayed under section 654. The court struck the two years of punishment for the on-bail enhancement (§ 12022.1, subd. (b)) under section 1385, subdivision (b)(1). The court imposed a sentence of 364 days in county jail on the misdemeanor sexual battery charge (count 3), which was deemed served with presentence custody credits.

## II.  DISCUSSION

### A. THE WITNESS THREATENING CONVICTIONS

Defendant contends the evidence supporting his witness threatening convictions is insufficient as a matter of law. In particular, he challenges Joe's testimony that defendant was holding a knife when he called Joe a "snitch." He argues that when considered

4

without Joe's untrustworthy testimony regarding the knife, merely calling someone a "snitch" does not necessarily threaten violent retaliation for cooperating with law enforcement, but can also refer more generally to anyone who "tells on someone." Defendant asserts he was calling Joe a "snitch" because Joe informed other family members about the incident, not because Joe reported it to police.

### 1. Defendant Communicated A "True Threat"

We must first determine whether defendant communicated a "true threat" with speech not protected by the First Amendment. (*Counterman, supra,* 600 U.S. at pp. 72–74; *Virginia v. Black* (2003) 538 U.S. 343, 359.) A "threatening statement[ ] that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence', rather than an expression of jest or frustration", is not protected speech. (*People v. Lowery* (2011) 52 Cal.4th 419, 427 (*Lowery*) [quoting *Black*, at p. 359.].)

When a defendant raises a plausible First Amendment defense, we independently examine the record "to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (*In re George T.* (2004) 33 Cal.4th 620, 632 (*George T.*).) "[I]ndependent review is different from de novo review; we do not make an entirely ' "original appraisal" ' of the evidence. Rather, we defer to the credibility determinations of the trier of fact, who was 'in a superior position to observe the demeanor of witnesses.' Moreover, we independently review only factual findings implicating the First Amendment, such as a finding that the communication at issue was a true threat and therefore unprotected by the First Amendment. In sum, we generally review for sufficiency of the evidence under the substantial evidence standard, but independently determine whether [a defendant's] expressive conduct was protected by the First

5

Amendment or was a true threat." (*People v. Peterson* (2023) 95 Cal.App.5th 1061, 1067–1068 (*Peterson*); *George T.*, at p. 634.)

Based on our independent review, we conclude a reasonable person would understand defendant's statement and conduct—in light of the context and surrounding circumstances as found by the jury—to communicate a true threat. Defendant knew he was being investigated for sexual battery. He also knew that Joe had spoken about the incident to defendant's ex-wife, who then told defendant. After Doe informed Joe that defendant was "looking for him," defendant saw Joe on the street, jumped out of his car, and called him a "snitch," possibly while holding a knife. (We discuss defendant's challenge to Joe's testimony regarding the knife in further detail below.)

We acknowledge that calling someone a "snitch" does not always imply a threat of violence. But it is reasonable to conclude that in the context of an ongoing criminal investigation, defendant's looking for Joe and calling him out as a "snitch"—with or without a knife in hand—carried two implicit but clear connotations: defendant was communicating that he knew or suspected Joe was cooperating with law enforcement about the matter, and that there would be consequences to Joe from cooperating. The term "snitch" in this situation and context may carry "an inherent baggage of connotation" which suggests a threat is being communicated. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.)

### 2. Substantial Evidence Supports the Witness Threat Convictions

We review claims of evidentiary insufficiency for substantial evidence. Under that standard, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the elements of the crime beyond a reasonable doubt. (*George T.*, *supra*, 33 Cal.4th at pp. 630–631.) In determining whether substantial evidence supports the conviction we do not reweigh or resolve

6

conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate witness credibility. (*People v. Little* (2004) 115 Cal.App.4th 766, 771.)

Applying these standards, we reject defendant's assertion that there was no evidence that Joe either reported the incident to police or that defendant had reason to believe Joe had reported or planned to report the incident. Joe was not the first person to report the crime, but there was ample testimony he encouraged his daughter to report it and that he also spoke with the investigating detective about the incident multiple times. The same detective spoke with defendant, who therefore knew someone had reported the crime. Doe testified defendant learned from his ex-wife that Joe knew about the incident. Doe had also told Joe that defendant "was looking for him" after the interviews and before defendant confronted Joe on the street. The jury heard testimony and argument regarding the animosity between Joe and defendant, which was the focus of his counsel's attack on Joe's credibility.

The jury could reasonably infer from the evidence and defendant's conduct that he knew or suspected Joe had cooperated with police, and that defendant was attempting to discourage Joe from any further cooperation. (See *People v. Young* (2005) 34 Cal.4th 1149, 1211; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344–1345 [a defendant's words not only expressed dissatisfaction with a witness's past testimony but also attempted to dissuade her from giving testimony in the future].)

We also reject defendant's assertion that Joe's testimony about a knife must be disregarded. Defendant argues that Joe's testimony was undermined by inconsistencies in his account and also by his animosity toward defendant. Credibility determinations are for the jury, which was entitled to credit Joe's testimony notwithstanding inconsistencies or competing evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Nor are we persuaded by defendant's argument that the jury necessarily disbelieved or discredited Joe's testimony about the knife by finding the section 12022,

subdivision (b) deadly weapon allegations not true.  The jury was correctly instructed that "[s]omeone personally uses a deadly or dangerous weapon if he or she intentionally … [¶] [d]isplays the weapon in a menacing manner."  (*People v. Wims* (1995) 10 Cal.4th 293, 302–303, overruled on other grounds in *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325–326.)  Here, the jury could have accepted Joe's testimony that defendant was indeed holding a knife, yet have been unsatisfied with evidence that he intentionally displayed the knife "in a menacing manner."  (*People v. Allen* (1985) 165 Cal.App.3d 616, 623 ["a jury is entitled to reject some portions of a witness' testimony while accepting others"].)  Joe testified that defendant "pulled a knife" on him, but beyond that did not describe any specific aggressive or menacing gestures or movements toward him with the knife.  Alternatively, the jury could have rejected Joe's testimony about the knife entirely, yet still have found sufficient evidence in the surrounding circumstances to conclude defendant's calling Joe a snitch was intended as a violent threat, given evidence of the two men's acrimonious history, Joe's stated belief that defendant was often armed, and the effect the confrontation had on Joe as well as a bystander.  Because one need not possess a weapon to communicate a serious intent to commit a violent act, the jury's uncertainty as to the weapon allegation does not preclude guilty verdicts on the underlying counts.

Defendant also argues Joe was not a "witness to a crime" under section 136, subdivision (b).  He asserts that the only sensible interpretation of the phrase is that it refers to a percipient witness who can give admissible factual testimony in a proceeding.  But beyond merely quoting the statute, defendant cites no legal authority or reasoned argument interpreting its text.  We therefore conclude defendant has forfeited this argument.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1181–1182 [failure to support claim with adequate argument forfeits the claim as not adequately raised]; *People v. Halim* (2017) 14 Cal.App.5th 632, 644, fn.8 [" '[i]ssues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the

8

issues' " forfeited].)  But even if not forfeited, we would reject the argument.  The broad purpose of section 136.1 "is to promote cooperation with law enforcement by criminalizing the conduct of those who seek to short-circuit investigatory efforts by dissuading victims and witnesses from reporting crime."  (*People v. Reyes* (2020) 56 Cal.App.5th 972, 985.)  The statute defines the term "witness" to broadly include "any natural person" "having knowledge of the existence or nonexistence of facts relating to any crime", "has reported any crime" to law enforcement, as well as anyone "who would be believed by any reasonable person to be an individual described" in those categories. (§ 136, subd. (2).)  If the Legislature had intended to limit the statute to include only percipient witnesses as defendant proposes, it would not have defined "witness" so broadly.  And of course, Joe *was* a witness who was interviewed by police and who also testified at trial regarding the sexual battery charge.

## B.  THE JURY INSTRUCTIONS SATISFY *COUNTERMAN'S* MINIMUM SUBJECTIVE INTENT REQUIREMENT

According to *Counterman*, *supra*, 600 U.S. at p. 69, the First Amendment requires the prosecution to prove a mental state of at least recklessness in any criminal offense based on true threats of violence.  At a minimum the prosecution must show "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence."  (*Ibid*.)  Counterman was "prosecuted in accordance with an objective standard" (*Id.* at p. 82) under which the prosecution "had to show only that a reasonable person would understand [his] statements as threats"; the prosecution did not demonstrate any awareness by Counterman that his statements could be understood that way.  (*Ibid*.)  The lack of any subjective intent element was found to violate the First Amendment.  (*Ibid*.)

### 1.  The Model Penal Code's Culpability Hierarchy

*Counterman's* minimum subjective intent requirement of "recklessness" is a reference to the Model Penal Code's definitions of culpability (see *Counterman*, *supra*,

600 U.S. at pp. 78–79.), under which "the ambiguous and elastic term 'intent' is replaced with a hierarchy of culpable states of mind.  The different levels in this hierarchy are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence." (*United States v. Bailey* (1980) 444 U.S. 394, 404 (*Bailey*) [citing Model Pen. Code § 2.02].)

As *Counterman* explains, under the Model Penal Code, "The law of *mens rea* offers three basic choices.  Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove.  A person acts purposefully when he 'consciously desires' a result—so here, when he wants his words to be received as threats.  [(*Bailey*, *supra*, 444 U.S. 394 at p. 404.)]  Next down, though not often distinguished from purpose, is knowledge.  *Ibid*.  A person acts knowingly when 'he is aware that [a] result is practically certain to follow'—so here, when he knows to a practical certainty that others will take his words as threats.  *Ibid*.  […]  A greater gap separates those two from recklessness.  A person acts recklessly, in the most common formulation, when he 'consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another.'  [Citation.]  That standard involves insufficient concern with risk, rather than awareness of impending harm.  [(See *Borden v. United States* (2020) 593 U.S. 420, 427 (plurality opinion)]."  (*Counterman*, *supra*, 600 U.S. at pp. 78–79.)

California has not adopted the Model Penal Code.  But in "a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." [2] (*Bailey*, *supra*,

_____

[2]  Under California law, " 'An intent is forward looking; it is the end in view, the object to be accomplished by the action taken, which is its criterion.'  If the end in view is simply a proscribed act we ordinarily call that a general intent.  'When the definition ... consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence .... [the] intention is deemed to be a general criminal intent.'  When the end in view looks to a consequence to be derived from the act, we call that a specific intent.  'When the definition [of an offense] refers to defendant's

10

444 U.S. at p. 405; see also Model Pen. Code (1985) § 2.02, subd. (3); Model Pen. Code & Commentaries, explanatory note to § 2.02, subsection (3) at p. 228 ["There is a rough correspondence between this provision and the common law requirement of 'general intent.' "].)  Because common law crimes of general and specific intent are roughly analogous to the Model Penal Code's concepts of "knowledge" and "purpose", the intent requirements of such common law crimes generally will satisfy *Counterman's* minimum subjective intent requirement of "recklessness."  (See Model Pen. Code § 2.02, subd. (5) ["When recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly."]; and Model Pen. Code & Commentaries, explanatory note to § 2.02, subd. (5) at p. 228 ["[I]f the crime can be committed recklessly, it is no less committed if the actor acted purposely."].)

### 2.  Penal Code Section 140, Subdivision (a)

Penal Code section 140, subdivision (a) is a general intent statute which prohibits making threats of violence against a crime victim or witness.  (*Lowery*, *supra*, 52 Cal.4th at p. 426; *People v. McDaniel* (1994) 22 Cal.App.4th 278, 284 (*McDaniel*).)  "Section 140 applies when a person 'willfully uses force or threatens to use force or violence upon the person of a witness to, or a victim of, a crime or any other person ... because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding.'  (§ 140, subd. (a).)  'The acts proscribed in section 140 ... take place because the witness, victim, or informant has provided information or assistance to a law enforcement officer.  The statute is retrospective rather than prospective and proscribes acts which are retaliatory rather than acts to intimidate.'  ([*McDaniel*, *supra*,

---

intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' [*People v. Hood* (1969) 1 Cal.3d 444, 456–457.]" (*People v. Lyons* (1991) 235 Cal.App.3d 1456, 1460.)

22 Cal.App.4th at p. 284, italics omitted.)]" (*People v. Pineda* (2022) 13 Cal.5th 186, 248 (*Pineda*).)

Here the trial court first instructed jury with CALCRIM No. 252: "The crimes charged in Counts 1 through 4 require proof of the union, or joint operation, of act and wrongful intent. [¶] The following crimes require general criminal intent: Threatening a Witness After Testimony or Information Given, as charged in Count 4. … For you to find a person guilty of this crime … , that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she *intentionally does a prohibited act*; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation." (Italics added.)

The trial court instructed the jury on the elements of section 140, subdivision (a) with CALCRIM No. 2624: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. Joe Paigly gave information to a law enforcement officer in a criminal case; [¶] 2. The defendant *willfully* used force or threatened to use force or violence against Joe Paigly *because* Joe Paigly had given that information; [¶] AND [¶] 3. A reasonable listener in a similar situation with similar knowledge would interpret the threat, in light of the context and surrounding circumstances, as a serious expression of intent to commit an act of unlawful force or violence. [¶] *Someone commits an act willfully when he or she does it willingly or on purpose.*" (Italics added.)

We reject defendant's argument that the jury was not required to find that he subjectively intended to threaten Joe. These instructions exceed *Counterman's* minimum showing of recklessness. Section 140's intent requirement (that the defendant willfully communicate a serious threat of violence) combined with its scienter requirement is roughly equivalent to the Model Penal Code's definition of "purposeful" culpability. In the Model Penal Code's terms, the jury found defendant acted "purposefully" insofar as it was defendant's "conscious object to engage in conduct of that nature" (i.e., intentionally

12

threatening serious violence) while "aware of the existence of [attendant circumstances]" (i.e., that Joe was a witness) or believing that such circumstances exist. (Model Pen. Code, § 2.02, subd. (2)(a)(i)-(ii).)

The jury could not have convicted defendant without finding (1) that he had willfully—i.e., intentionally, willingly or on purpose—threatened Joe in a way that a reasonable person would interpret as "a serious expression of intent to commit an act of unlawful force or violence" (*Lowery*, *supra*, 52 Cal.4th at p. 427), and (2) that defendant did so *because* he knew (or at least believed) Joe was cooperating with law enforcement. "The word 'because,' in essence takes the place of 'knowledge' or 'knowingly' in section 140." (*McDaniel*, *supra*, 22 Cal.App.4th at pp. 285–286, 310.)

### 3. Penal Code Section 136.1

We are equally unpersuaded by defendant's argument that the instructions regarding section 136.1, subdivision (c) also violated *Counterman* because the jury was not required to examine defendant's subjective intent to threaten violence. Violating section 136.1, subdivision (c) is a specific intent crime. (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347; *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1460.) The statute requires that the defendant intended to prevent a crime from even being reported (*People v. Brackins* (2019) 37 Cal.App.5th 56, 67), or intended "to induce a witness or victim to withhold evidence of a crime from law enforcement officials," *Navarro*, at p. 1352.

Section 136.1 defines the crime of dissuading a victim by threat of force. Subdivision (b)(1) of that section describes the basic crime, and subdivision (c)(1) describes an aggravated form when committed knowingly and maliciously. A violation of "subdivision (b)(1) of section 136.1, 'does not require that the defendant act knowingly and maliciously.' Instead, to 'prove a violation of section 136.1, subdivision (b)(1), the prosecution must show (1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report

13

of their victimization to any peace officer or other designated officials.' The prosecution must also prove the defendant specifically intended that his acts would prevent or dissuade the victim or witness from making the report." (*People v. Cook* (2021) 59 Cal.App.5th 586, 590 (*Cook*).)

"Under section 136.1, subdivision (c), a violation of subdivision (b)(1) is subject to heightened penalties if the defendant acted 'knowingly and maliciously' and committed the offense under additional specified circumstances. (§ 136.1, subd. (c)(1), (2), (4).) Those circumstances include, among other things, that the act was accompanied by force upon the witness. (§ 136.1, subd. (c)(1), (2), (4).)" (*Cook, supra,* 59 Cal.App.5th at pp. 590–591.)

The trial court instructed the jury on the general elements of section 136.1 with CALCRIM No. 2622: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant *tried to prevent or discourage* Joe Paigly from … seeking the arrest of [defendant] in connection with a crime; [¶] 2. Joe Paigly was a witness; [¶] AND [¶] 3. The defendant *knew* he was trying to prevent or discourage Joe Paigly from arresting or causing or seeking the arrest of [defendant] in connection with a crime." (Italics added).

The trial court also instructed the jury with CALCRIM No. 2623: "If you find the defendant guilty of intimidating a witness, you must then decide whether the People have proved the additional allegation that the defendant acted *maliciously and used or threatened the use of force*. [¶] To prove this allegation, the People must prove that: [¶] (1) The defendant *acted maliciously*; [¶] AND [¶] (2) The defendant *used force or threatened*, either directly or indirectly*, to use force or violence* on the person … of a witness. [¶] A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice." (CALCRIM No. 2623 [italics added].)

14

These instructions exceed *Counterman's* requirement that the prosecution prove defendant's subjective mental state was at least recklessness. The jury found defendant "knowingly" attempted to prevent or dissuade Joe from making a report to law enforcement in violation of section 136.1, subdivision (b)(1). (See *Lyons*, *supra*, 235 Cal.App.3d at p. 1461 (fn. omitted) ["In section 136.1 … the modifier "knowingly", [ ] makes clear that the relation of act to consequence must be known to the actor. Such a knowing act is ordinarily a criterion of intention."].) In addition, to find defendant guilty of the aggravated charge under section 136.1, subdivision (c), the jury had to find defendant acted with malicious intent (i.e., with the unlawful intent to "annoy, harm, or injure" Joe) and that defendant "threatened … to use force or violence." That finding of "specific intent" necessarily determined that defendant subjectively intended to annoy, harm or injure Joe and did so intentionally by threatening Joe with violence.

## C. AN UNCONSCIOUSNESS INSTRUCTION WAS NOT REQUIRED

The trial court instructed the jury on the elements of sexual battery with CALCRIM No. 938: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant touched an intimate part of [the victim]; [¶] 2. The touching was done against [the victim's] will; [¶] AND [¶] 3. The touching was done for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." The jury was further instructed that sexual battery is a specific intent crime: "For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state" and the "specific intent and/or mental state required for the crime of Sexual Battery, … is that the defendant touched an intimate part of [the victim] for the specific purpose of sexual arousal, sexual gratification, or sexual abuse."

The trial court also instructed the jury on "mistake of fact" as requested by defendant: "The defendant is not guilty of sexual battery, as charged in Count 3, if he did not have the intent or mental state required to commit the crime because he did not know

15

a fact or mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit sexual battery. [¶] If you find that the defendant believed that he was touching an intimate part of [Doe] for the specific purpose of sexual arousal, sexual gratification, or sexual abuse he did not have the specific intent or mental state required for sexual battery. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for sexual battery you must find him not guilty of that crime." (CALCRIM No. 3406.)

During deliberations, the jury sent the following question to the court: "If a person believes that [defendant] touched [the victim] entirely while asleep and not conscious of his actions, does that constitute Mistake of Fact? Does/can that constitute a lack of intent or mental state require[d] to commit the crime?" After reviewing the evidence relating to the possibility that defendant was asleep during the alleged sexual battery, the trial court ruled that the evidence did not warrant an unconsciousness instruction. The evidence included the victim's testimony that defendant had mumbled "I want to eat your pussy", touched her buttocks and hips and then grasped her vagina while she was sleeping. The evidence also included Doe's testimony that defendant looked sleepy before he lay down, appeared groggy when he got up, and later told her he didn't remember what had happened and it was "like a dream." The trial court observed that "the defense requested a [mistake of fact] instruction, and I gave that instruction with regard to its theory of the case. That theory is arguably inconsistent with a theory that the defendant was asleep and unconscious during the events that involved [the victim]." After discussion with counsel, the trial court referred the jury to its previous instructions and declined to instruct the jury with the modified unconsciousness instruction (CALCRIM No. 3425) proposed by defense counsel: "If a juror believes that [defendant] was sleeping at the time of the touching, or the incident, then he lacks a specific intent to … commit a sexual battery, and therefore, is not guilty."

16

Defendant argues the trial court should have given an unconsciousness instruction in response to the jury's question. He describes his primary defense against the sexual battery charge as being asleep and therefore unable to form the necessary specific intent to achieve sexual arousal, sexual gratification, or sexual abuse that is an essential element of the crime. We acknowledge defendant disputed that he possessed the requisite specific intent. We note, however, he claimed that a mistake of fact about identity caused him to misdirect his actions toward his unwilling niece rather than toward her (purportedly) willing mother.

We see no abuse of discretion in the trial court's determination. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1032 [" 'An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury.' "])[3] "Unconsciousness, when not voluntarily induced, is a complete defense to a charged crime. 'Unconsciousness does not mean that the actor lies still and unresponsive. Instead, a person is deemed "unconscious" if he or she committed the act without being conscious thereof.' A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Rogers* (2006) 39 Cal.4th 826, 887 (*Rogers*).)

A criminal defendant has the burden to produce evidence of unconsciousness in support of that defense. (*People v. Froom* (1980) 108 Cal.App.3d 820, 830.) Such evidence typically consists of the defendant's or an expert's testimony regarding unconsciousness. (See, e.g., *Rogers*, *supra*, 39 Cal.4th at p. 887.) Absent expert

---

[3] Defendant asserts the trial court's ruling should be reviewed de novo because the instructions given by the court regarding intent were not full and complete. However, the trial court did not provide incomplete or incorrect instructions, but rather determined that the evidence did not warrant giving a particular instruction.

testimony regarding defendant's mental state during an incident, or other evidence of the circumstances surrounding the crime, a defendant's "professed inability to recall the event," without more, is insufficient to warrant an unconsciousness instruction. (*Rogers*, *supra*, 39 Cal.4th at p. 888.)

Although defendant did not request an unconsciousness instruction, defense counsel mentioned in closing argument that the victim and her mother had both speculated that defendant might have been asleep during the incident. But speculation is not evidence, much less substantial evidence. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, disapproved on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1.) An unconsciousness instruction was not required here, despite any speculation from the victim or Doe about defendant being asleep. The victim was sleeping until she was awakened by defendant's "grasping" her vagina and whispering in her ear; she did not attempt to look at or speak to him to see if he was awake because she was scared and confused. Doe could not know whether defendant was asleep because she was not in the bedroom at the time. There was no expert or other evidence regarding defendant's purported unconsciousness, nor did he initially request an unconsciousness instruction, opting instead to present a mistake of fact defense. The trial court did not abuse its discretion by declining to instruct on unconsciousness in response to a jury question.

## III. DISPOSITION

The judgment is affirmed.

18

_____

Grover, Acting P. J.


**I CONCUR:**



_____

Bromberg, J.

Lie, J., Concurring:

I agree with the majority that the evidence is sufficient to support defendant Jeremy Paigly's convictions under Penal Code sections 136.1, subdivision (c)(1) (count 1) and 140, subdivision (a) (count 4).[1]  I also agree with the majority that Paigly's convictions do not offend the First Amendment.  I respectfully part ways with my colleagues only to the extent that they deem it necessary to reconcile these guilty verdicts with the jury's not-true finding on the allegation that Paigly used a dangerous or deadly weapon.  (§ 12022, subd. (b)(1).)

It has long been established that our " 'criminal justice system . . . gives . . . juries the power to acquit whatever the evidence,' " and "there is no requirement of consistency among verdicts." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1122, 1121, citing *Harris v. Rivera* (1981) 454 U.S. 339, 345.)  In reviewing any given count or allegation for substantial evidence, we consider the nature and quality of the evidence supporting that count or allegation, not the overall coherence of the jury's decisionmaking.  (*People v. Lewis* (2001) 25 Cal.4th 610, 656; see also *United States v. Powell* (1984) 469 U.S. 57, 67.)  So we are not bound by factual determinations seemingly implicit in other aspects of the jury's verdict. (*Ramirez*, at pp. 1121–1122.)

Perhaps, as the majority and the People maintain, there is a distinction between visibly holding a knife while accusing one's brother of being a "snitch," under sections 136.1 and 140, and the menacing display of the knife, under section 12022, subdivision (b)(1). (Maj. opn., *ante*, at pp. 8–9.)  If so, that distinction strikes me as an exceptionally subtle one.  Perhaps, as the majority maintains, Paigly's finding and loudly confronting his brother by calling him a snitch—while *not* displaying a knife—would suffice to meet the statutory elements of the offenses.  But if truly limited to this latter scenario, I would lack the majority's confidence that such conduct would constitute a

---

[1] Undesignated statutory references are to the Penal Code.

"[t]rue threat[]" for First Amendment purposes.  (*Counterman v. Colorado* (2023) 600 U.S. 66, 69; maj. opn., *ante*, at p. 5.)

_____
LIE, J.

*People v. Paigly*
H050724